I want to just go over my understanding of who's presenting what. My understanding on behalf of the appellants, you've got Mr. Frazier for 11 minutes, is that right? Then Ms. Sprague for 5 minutes, and then Mr. Sorensen for 4 minutes, is that correct? And then on behalf of Idaho et al., it's Mr. Moroney, is that right? For 20 minutes, okay. Very well. Mr. Frazier, please proceed. Thank you, Your Honor. Good morning. May it please the Court. My name is Ryan Frazier, and I represent the Northwestern Band of the Shoshone Nation. It is a federally recognized Native American tribe, and I'll call it the Northwestern Band today for short. The issue on appeal is whether the Northwestern Band has hunting and fishing rights under the treaty between the United States and the Shoshone and Bannocks, which was signed by the parties on July 3, 1868, at Fort Bridger. And I'll refer to that today as the 1868 treaty. Agents of the State of Idaho have refused to recognize the Northwestern Band's rights to hunt and fish under the treaty. The Northwestern Band, therefore, filed this action in the District Court for the District of Idaho, seeking a declaratory judgment that the tribe's hunting rights were preserved by the treaty, and that such rights have not been extinguished since the treaty was signed. The District Court for the District of Idaho dismissed. It did so on the ground that it concluded that the tribe lost its reservation. However, dismissal was improper, both under the plain language of Article 4 of the treaty, in which that hunting right is set forth, and on the ground that it is inconsistent with other law. When we submit this case, the Northwestern Band asks that the court reverse the District Court, and instead rule as a matter of law that the hunting and fishing rights are not conditioned upon the promise to relocate to a reservation. Let me add to this, I mean, as you know well. Whenever we construe these treaties from more than a century ago, it's always a challenge to know what exactly the parties meant. So we do our best to understand. We have the Indian canon, which we applied, although it's kind of interesting. We have a different band of the Shoshone that's not in this argument now, but will eventually probably will be, and we don't know how that's going to impact the Indian canon. But let's just take the treaty as it is now, and I'll just start by asking this question. As I read it, the hunting rights are only mentioned in the same sentence as the relocation promise. Aren't they linked together? Well, I don't think there's any doubt that the two are somehow linked. I think the key question is whether the second clause, in which the hunting right is set forth, is conditional on the first. Now, what's your best argument that they're not conditional? I think there are two arguments there, Your Honor. The first is the fact that the United States Supreme Court has already interpreted exactly the same language in the case of Herrera versus Wyoming. In that case, the issue was exactly whether the hunting rights of the Crow tribe had been eviscerated by Wyoming statehood. And the language in that treaty as the United States Supreme Court recognized is identical to the language set forth herein. But in that case, wasn't there a relocation? Didn't the Indian tribe in that case actually relocate, unlike what you had here? They did, Your Honor. But even so, in that case, the United States Supreme Court recognized only four conditions in which that right would have been eviscerated, and relocation to a What it did is it recognized there were only the four instances in which that would happen. One, the land is no longer unoccupied. Two, the lands no longer belong to the United States. Three, game can no longer be found thereon. And four, tribe and the non-Indians are still at peace. Let me ask you this then. Let's say your argument is correct. What would be the legal remedy of the United States for the failure of the Northwest Band to relocate to the reservation? Well, I think, Juan, that would be up to them to decide. There certainly is a promise set forth in the First Provision. But I don't believe it is to declare their hunting rights null and void. Okay. And I understand that's your position. Sure. But what I'm just saying is a matter of construction. What's the quid pro quo? If there's no relocation, is there no penalty? Well, I think it's important to understand when you mention quid pro quo, what is the quid pro quo in this instance? I think the real quid pro quo was the fact that the tribe gave up all of its lands. It ceded those to the United States. And in exchange, it reserved the hunting right and the opportunity to move to the reservation. So is it your position, which I understand, that basically the real consideration, if you will, was the giving up of rights of vast territory? Absolutely. And that was, if you will, the consideration? And that the hunting rights, were they independently existing? They were just being recognized by the United States? Or were they created by the United States pursuant to the language of the treaty? No, they already existed. I think going back to property law, we think about property as a bundle of sticks. And in this case, the right to hunt and fish on the land was one of the rights attendant to title. When the tribe essentially ceded what they may not have thought of as title, but what we would consider title to the property, they ceded most of what they had. However, what was retained is what was reserved. Part of that was the creation of these land reservations. But in addition was a reservation of the right to hunt and fish on the unoccupied lands of the United States. And so that right was preserved. It was the thing that was held back in the session of the land. And the hunting right expands to a much greater area than the reservation that was being set aside. Is that correct? That's correct. It's technically an off-reservation hunting right. And so it was to be on, as the treaty says, the unoccupied lands of the United States. So basically they could hunt in Delaware. Well, the treaty itself ties it specifically to their ancestral lands that were within the, that were ceded. So basically the tribe gave up those ancestral lands, but retained the right to hunt within those ancestral lands. That is correct, Your Honor. And I think the other reason, I told you there were two reasons why that it should be determined that, is even when we look at the plain language. There's not language within the treaty itself, Article 4 in particular, that would create a condition. The word but is what the district court relied upon in making that determination. However, as we know, but does join the two clauses together, but it does not necessarily create a condition. In this case, I would posit that it did not. Rather, what it did is it created a contrast between what the tribe could do on reservation, reside, make their permanent home, and what they could do off reservation, which is to hunt and fish. And so that's what the word but was in there for, is to explain what they can do on reservation and what they can do off reservation. Counsel, I think that's a strong point for you. The district court, in addition to focusing on the word but, also focused on the word they. It's used multiple times and made the point, shouldn't they mean the same thing in all of its uses in that provision? And if so, then they refers to the people who are going to make their home on the reservation and then also have the hunting rights. Why isn't the district court's point about the word they a good one? Well, I think the answer to that, Your Honor, is simply the fact that a Northwestern band, like the other Shoshone tribes, gave up their land. And in doing so, they did it under that treaty, and that's been recognized by multiple cases. And I don't even think the state of Idaho disputes that. But when we look at they, we're talking about those that had ceded their land. And that included all of the tribes. Chief Washakie had signed the treaty on behalf of each one of those tribes. And as such, they really refers to those who retained the right. Counsel, is there any significance to the fact that I believe the record reflects that some point the United States offered reservation land to the Northwestern band and it was declined, but there was no action on the part of the United States to require the Northwest band to move to a reservation? That's correct. There was some land that had been proposed, but it did not meet their needs. It was inadequate. And since then, there's been no effort to create another reservation for them. As I understand it, there was at least at the time it was contemplated the United States would expend some sums to prepare living quarters or so on on the reservation. And that never occurred. Is that correct? Well, there were first, there were two reservations. And at some point, there were structures and things and they were eventually built. We don't know what the timing was exactly on that. But the structures were erected. Now, I know that I know they're not party to that at this point. But I just want to understand, you have a different, I'm saying it wrong, a different branch of the Shoshone Nation that take a different position and they went to the reservation or some reservation. Should that play any role in this case? They're not a party, but we know they're back there. Should that play a role in this case? I don't think so, Your Honor. Before the district court, an undecided issue was whether Rule 19 required that they be joined. And the response that we gave in that case is no, they're not necessary parties, just for the simple fact that we're not talking about a zero-sum game. What we're talking about is a declaration of rights. In my mind, it's much like the fact that we all have the constitutional right to assemble. However, we've got the square across the street that has limited capacity. Well, if I took my group there and I wanted to assemble and another group wanted to as well, well, we could have conflicting ability to use the square. But it doesn't change the right that both parties have the right to assemble. That's what we're talking about here is a universal right to assemble among all tribes that were subject to the treaty. Now, what that looks like afterwards, if there are conservancy concerns, things of that nature, that can be addressed at a later date. And they might have an interest there, but not so much in whether our tribe has the right itself. You want us to declare the district court was simply wrong and that the hunting reservation rights are independent of relocation on the reservation. Is that correct? Your Honor, I see my time is up. If I may answer the question. Yes, please do. The answer is yes. That's what we believe the treaty says. And we believe that that's what this court should do. Very well. Any questions by my colleague? Very well. All right. So, Ms. Sprague, please. I gather you're preparing for the United States. Is that correct? Yes, Your Honor. Mary Gabrielle Sprague here for the United States as amicus curiae. Taking up your question about what the U.S. remedy would be, if the United States considered the failure to move to one of the reservations to be a material breach at the time of the late 1860s, early 1870s, the United States had military forces that could take action. If the promise that the tribe made to not impede white settlement was broken, if they had, for example, insisted that they still held Indian title that was good against other title, or if they were simply not keeping the peace and there was violence, there would be a remedy then. As Judson pointed out, that in the 1870s, the United States was looking for other land for this group, Northwest Band, that would be more suitable. And some members did go to that other land in Nevada. But this group that did not go to one of the reservations is presently recognized as a federally recognized Indian tribe with which the United States maintains a government-to-government relationship. And I gather the position of the United States is one that is in accord with the Northwest Band. You believe the United States takes the position that the hunting right exists independent of whether there had been a relocation to the reservation. Yes, absolutely, Your Honor. And that is a question of common English usage and contract drafting principles that we understand before we even get to the point of looking at all the circumstances and the Indians' understanding. Typically, you often have a tension where, given our formulation, it looks to English speakers, people who may be conversant with the law, that these words mean something. And then the protest is, but the Indians did not understand it that way. Let me ask you this. In 1985, the Department of Justice wrote a memorandum. The Department of the Interior, Your Honor. Exactly, that's right. Excuse me, Department of the Interior, basically siding with what the Northwest Band said. The district judge in this case, I guess Judge Nye, just basically ignored it. On the theory, I think that they had not relocated. What's your response to that? Should the district judge err in not giving greater weight to the Department of Interior memo? Your Honor, there's no question that it rises to the level of chevron deference. We're talking about a statement of the United States as to a treaty that it has responsibilities to implement. And it was worthy of consideration. If the district court had identified real problems with that memo, it was free to do so. The reasoning was incorrect for various reasons. But the reasons that it gave as to why that memo were deficient were wholly unpersuasive. OK. We, yes, we do support the position of the Northwestern Band. We do not see the first clause as a condition on the second clause for all the reasons that we have explained. We do think the Herrera case is illuminating, even though it addressed the question of abrogation by statehood. The central point is that the band upheld their part of the deal. They ceded their land. They just kept the reserved hunting rights because they were starving and that was necessary for their livelihood. Now, fortunately, the members of the band are not starving. But still, this is a very important part of their cultural identity that they ask to be allowed to continue. And there's nothing in the treaty that says they can't. In fact, as we read the treaty, the relocation is not a condition. Again, we have to go, was it a material breach? We don't believe it can be argued that it was a material breach in these circumstances. And therefore, the district court should be reversed. I just want to say, this is extraordinary. A rejection of a claimed treaty right with two pages of briefing by the tribe on the substantive issue, it's extraordinary. And they held up their part of the bargain. The United States is simply asking that they get their fair day in court, a fair reading of the treaty, and the opportunity to present their historical evidence if necessary. Go ahead. Can I ask one question, counsel? Do you place any significance on Article 2, I believe, of the declaration which suggests that the second reservation would – was not a sure thing, the way I read the plain language of that, that it was – That's correct. If either the Banninks or the U.S. government wanted a second reservation, which suggested to me that it was not assumed that all of the Banns would relocate to reservation at the time that this treaty – Yes, Your Honor. Is that consistent with the U.S. interpretation? Yes. We do rely on that. The fundamental mistake the district court made out of the box is that it was looking at the treaty as a grant of a right, not a reservation that could be terminated. So when you add in this uncertainty, that does support our view that the tribe did not understand that that was a condition because there was so much uncertainty. There were no deadlines. There was not even a reservation at the time it was negotiated. Other questions?  Thank you very much for your argument. Thank you, Your Honor. All right. The last person representing the appellate is Lance Sorensen, representing, I guess, the state of Utah, right? That's right, Your Honor. Lance Sorensen on behalf of the state of Utah, which is an amicus in favor of the Northwestern Band, and we agree with their position. Thank you for giving us a few minutes this morning, which we thought was important to emphasize two points, which you've touched upon, Judge Smith, in your conversation with Mr. Frazier, which was the district court got off on the wrong foot by misframing the issue of whether the hunting and treaty – the hunting and fishing rights under the treaty were a grant or a reservation. And I don't need to belabor the point, but the district court said it would make little sense for the government to grant hunting rights but not receive anything in exchange. And we think this framing of the issue mischaracterized the nature of the right, and the correct nature of that right has been recognized by this court in United States v. Washington, which stated that an Indian treaty involves a grant of rights from the Indians to the United States, not the other way around. And the court in Washington was following the lead of the United States Supreme Court when it interpreted the Stevens Treaty also as not a grant of rights to the Indians, but a grant of rights from them. Let me ask you this, Steve. With respect to the land, no question. But is it the position of the state of Utah that the Indians had this hunting right before? They didn't have to grant anything. They just reserved and kept the right. Is that your position? That's the position. And Utah includes ancestral fishing and hunting grounds of the Northwestern Band, which is why we're here. And so we also must construe this treaty. And so we see the hunting and fishing rights as a reservation. We think the best interpretation of that conjunctive word but is not a condition, but a clarification. Nevertheless, even though they're giving away all this land, nevertheless, they're maintaining their hunting and fishing rights, which were their means of survival in 1868. So in other words, from Utah's position, the giving of the land and the agreement to have peace and going to the reservation is one level. The hunting and fishing is a totally different issue. Is that right? I think the treaty has to be read in its entire context. And this is related to the second point, which is I think the district court missed what it was that the Indians were giving up. So this is a quote from the district court. The court said, the promise to live on the reservation was the most significant promise made by the Indians in that treaty. I would disagree. We're talking about 44 million acres of land, which the district court did not even address at all. The district court's misunderstanding of the treaty led it to conclude that adopting the tribe's interpretation of the treaty meant that the tribe gave only, quote, de minimis consideration. Again, I think it's hard to say that 44 million acres of land is de minimis consideration. I think the district court ignored the heart of the treaty, which was relinquishing land title. Reading the treaty this way leads to, I think, the more common sense interpretation that in giving up land title, the tribes wanted to ensure that they still had their fishing and hunting rights, which again, this is 1868. And we have a nearly decimated tribe trying to survive. So Utah submits that the treaty can be interpreted as a matter of law in the tribe's favor. But in the very least, we're here on appeal of granting a motion to dismiss where the tribe didn't even get to come in and gather evidence and present any evidence of what their interpretation of the treaty is. So from your perspective, if you were us and we wrote an opinion, what would you want it to say? Briefly. Well, let me start. I think the treaty can be interpreted on its face, and that's why we're here on appeal, is to interpret this provision of the treaty. And it can be interpreted as a matter of law to say that, number one, these hunting and fishing rights were never conditioned upon relocation. And if there are other issues that need to be remanded to the district court, they can be remanded. In other words, from your perspective, you want us to find that, send everything else back to the district court to gather evidence, essentially. If there are other issues that need to be determined. If there are other issues. Yeah. Very well. Any other questions by my colleague? Thank you all for your arguments.  All right. So we'll now hear from Mr. Moroney. Mr. Moroney, can you hear me? Before you get too far into it, the state technically is not involved anymore because of the sovereign immunity. Is that correct? Yes, Your Honor. The state was dismissed under 12B1. So we're just looking at ex parte relief against two states. And these are officers of the state? Is that correct? Yes. And before we get going too much, I just wanted to, if the court will allow me, take a second and recognize that we have four representatives from the Shoshone-Bannock tribes with us in court today. I think the audience has sort of switched sides. But we have Nathan Small, who's the chairman of the Fort Hall Business Council. That's the governing body of the Shoshone-Bannock tribes. Let me ask you this. And I respect all of you, appreciate your being here. But these folks are not part of this appeal, right? They will be. If we sent something back to the district court, then they would be involved, right? But they're not involved in this action. They're involved to the same extent that the state of Utah or the US is. They are an amicus. And the court accepted their status as an amicus. So they're an amicus in this case? Yes. Yes, they are, Your Honor. Very well. Thank you. All right. So to go back to the start, may it please the court, my name is Owen Maroney. I represent state official defendants. First, there's Ed Shriver, who's the director of the Idaho Department of Fish and Game. And additionally, there's Greg Wooten, who is the head of enforcement for Fish and Game. With me in court, I have four members of the Shoshone-Bannock Tribes, Nathan Small, the chairman, Lee Juan Tyler, and Gail Ann Edmo, who are also on the Fort Hall Business Council, and Bill Bacon, who's the lead tribal attorney. So, counsel, are you representing them today? No, I just wanted to point out that they're in the audience today. So I want to discuss the very clear connection between on-reservation residents and the hunting right reserved in the Fort Bridger Treaty. Article 4 unequivocally ties the hunting rights reservation to the double-emphasized requirement to make a residence on one of the enumerated reservations. That provision provides the Indians here are named will make said reservations their permanent home, and they will make no permanent settlement elsewhere, but they shall have the right to hunt on the unoccupied lands of the United States. Multiple things in the treaty, in Article 4, show the unequivocal tie between the permanent language, language, permanent homes language, and the hunting rights reservation. First, as the district court recognized, they is a pronoun that refers back to an antecedent, which is the Indians here are named who will make a home on the reservation when the reservation's prepared. But also connects the two clauses as a coordinating conjunction, indicating that both clauses are related. But the way you read but to mean essentially provided that, doesn't that really flip the order of the clauses in Article 4? That's what it looks like to me. You've got to flip the order grammatically. I mean, the way I read it was, you know, you have the double-emphasized requirement to make a permanent home on the reservation, but they shall have a right to hunt on the unoccupied lands of the United States. I mean, really the two are intricately connected. What makes that conditional, right? In the same clause, second clause, they shall have the right to hunt so long as. That to me tells the parties knew how to make something conditional expressly. They said, you have this right so long as these other conditions exist. To read but the way you're reading it, you would either have to say they use but instead of so long as. But even if you inserted the word so long as, in order to have the interpretation you're discussing, you would have to reverse the clauses as Judge Smith is suggesting. Yes, yes, Your Honor. I understand you're reading, and I think there was some bouncing around in making it conditional language. I think really the reality is they're just so intricately tied together. With respect, I know Judge Nye is a nice person, smart person, but did he get this right when he talked about that basically that the tribe didn't give up anything if it wasn't tied to going to the reservation? They gave up 44 million acres. Even today, that's a lot of territory. That's a major consideration, is it not? That's true that they did give up 44 million acres and they also made a promise of peace. I think under the Indian canons, they direct us to go back and interpret things how the tribe would have understood it at the time. At this point in time, there had been so many settlers had moved west that they functionally killed all the game. The tribe had seen the writing on the wall, and that is a major secession to cede 44 million acres. But really, when we look back at the negotiation between the tribe and the United States, what they talked about time and time again was the U.S. wishes the tribe to go to a reservation, and in return, the tribe would say, we want to be able to leave the reservation to hunt. What was the remedy of the United States if the tribe, in the case of the one brand, the Northwest band, if they didn't go back? What was their remedy? Military? Was that their remedy? I mean, as my colleague represented, it was a period where it was sometimes known as the reservation era, where the U.S. was, its policy towards the Indians was to try to remove them to reservations. Indeed, the very statute passed by Congress, 15th statute at large, 17, includes this permanent homes language directing the commission who negotiated with the Shoshone-Bannock tribes to negotiate treaties to provide for reservations that shall be and remain permanent homes for said Indians to be located thereon. Well, let me ask you this. Since the Bannock, I'm probably saying this wrong, the Bannock brand, a band of the Shoshones, you're representing them, or they are amicus. How does it work with the Indian canon when you've got two different Indian tribes that essentially derive their rights out of the same treaty? How does the Indian canon work in that? Does it disappear? Do we do our best to try to understand it the way the Indian tribe would do it? What do we do? Yes, Your Honor. What you're referring to can be found in the McCaw case. It does disappear as far as whether there's an ambiguity if you have two tribes claiming to be the signatories. Counsel, respectively, I don't think McCaw is on all fours with this case because McCaw involved a treaty who was clearly covered. I mean, a tribe who's clearly covered and a tribe who is admittedly not covered by the treaty having an interpretive dispute. In this case, we have two tribes who claim to be covered by the treaty. And I see your brief essentially conceding that the Northwest Band was represented in these treaty negotiations and did cede their land. And then as far as I can tell from the record, the amicus on your side have not actually taken a position on the treaty interpretation. They've taken a position that they would be impacted by the resolution of this case. But I don't see anything in the declaration that you included that they say we interpret the treaty the same way that Idaho does. Am I missing something there? Yes, Your Honor. I think you're talking about the declaration of Devin Boyer that can be found at Excerpt of Record 40. In that declaration, he includes the Shoshone-Bannock tribe's current tribal code, which still makes the ability to exercise off-reservation rights contingent on- The way I read that declaration, he seems to think, yes, that there's their condition, but that they do it in order to preserve game and not linking that practice necessarily to a limitation established by the treaty. Is there anything in the record that says they actually agree that the treaty makes the reservation of hunting rights conditioned on living on a reservation versus their own self-imposed restriction? All I could point to would be the declaration of Devin Boyer, so- Following up on that, so as Judge Sung brought up earlier, at the time the treaty was entered into, one of the anticipated reservations wasn't in existence. And so is it your position that the Native Americans who ended up on that reservation just didn't have hunting rights until the second reservation was created? No, I think we have to go back to 1868. And this was a time before hunting rights. It really doesn't make sense to reserve off-reservation hunting rights in 1868 unless you're being forced to go to a reservation. Anyone could simply hunt where they were. I mean, this is the Wild West. Well, we have many cases that said if there was not an express reservation of hunting rights, they would be giving up their right to hunt unceded territory. So just because they were not agreeing to move to a reservation, they were ceding land claims, right? They had to reserve their right to hunt in order to keep it. So I don't see how there's a necessary link to living on a reservation when they're giving up land claims to 44 million acres. Well, the state officials' claims would be that there is pursuant to the terms. But alternatively, if the court doesn't agree with me on that, I do want to address the fact that the Northwest Band and amicus claim that the court could simply resolve this on their favor or remand's not necessary. If they were successful on that, most we'd be looking at is an ambiguity on the treaty language. Oh, wait a minute. Wait a minute. Let me be sure I understand that. Here you've got the Northwest Band, one party of the treaty. You've got the United States, admittedly, as amicus. You've got the two parties of the treaty, and they agree. The two parties of the treaty agree that the reservation of hunting rights is separate. They're not contingent. What do we do with that? I know the state has interests and others have interests, but the United States says, and they have that 1985 memo that admittedly the district court didn't think was worth anything, but they said what the Northwest Band is saying is correct. We signed the treaty. They signed the treaty. End of story. What's the matter with that? So there are still very important issues that are out there, one being political cohesion. This was addressed on a motion to dismiss, and the district court declined to rule on political cohesion. But there's a very legitimate question here about Chief O'Shaughnessy was at Fort Bridger, signed the treaty on behalf of the tribe, reserved these rights going forward for another group that fractures away from the tribe. They have to demonstrate political cohesion with a signatory entity. That's a separate question from what I think you're arguing. I think there's no dispute that the political cohesion issue was not reached by the district court. But you seem to be arguing that we should also remand to resolve ambiguity in the interpretation of the treaty. And I think Judge Smith's question was, we have two parties to the treaty who agree on the interpretation. So why is there an ambiguity that needs to be sent back to the district court to resolve versus just the political cohesion question and indispensable party question? I think there is still a lot there that demonstrates that really the reservation hunting rights was the carrot that induced the tribe to move to the reservation. Right, why? If they had those rights before and they gave up 44 million acres, why do the hunting rights even factor into it? Those rights were critical. I gather you take the position the United States created those rights. Your opposition suggests that they had those rights before and they simply reserved them. But the big deal was the land and the peace, right? The reservation was a place for them to go. Some went, some didn't. I wouldn't take the position that the United States created those rights. They were a reservation of their aboriginal right. That's important and I agree with you. They had those rights. They had primordial rights. They kept those rights. And that's why I think in construing this treaty, it makes a difference in how you put the but in the language. Otherwise, it flips it around. And I'm struggling with how we can get to the point that we say they don't have hunting rights unless they move to the reservation because they had those rights before. I wasn't contingent on that, at least based on my understanding you're agreeing. They had those rights before. They reserved those rights, right? They would have had the rights before and they reserved them. That reservation was through the treaty and they would have, you know, this is the difficulty here because you do kind of, you start getting into political cohesion there. They would have had to be part of the individual tribal members don't have hunting rights. They're reserved by a tribe. To use a modern analogy, and I know it's really bad, you have a couple that has a home. They get a divorce. They still have the rights to the home. You have to divide it up afterwards, but the reality is the contract by which they bought the home is still the contract. Here you got a treaty. If they had a divorce in the tribe, they still have the treaty, right? Maybe they don't have visitation rights, but whatever. Yeah, I mean, I think, you know, that's really the rub in the case. I think also, you know, if I could just briefly touch on the other issues. Those are very much still out there. And I will, sorry, I don't mean to derail you, but I just want to also clarify your interpretation of the treaty. If you're saying those reserved hunting rights conditioned on relocation to reservation, that condition would apply to all of the bands who are parties of the treaty, right? So any band that didn't relocate would have, in your view, not had reserved hunting rights. So if, for example, excuse me, the Bannock had never gotten the potential reservation that is referenced in Article 2 of the treaty, if neither the band nor the U.S. government had actually moved to create a second reservation, they would have no reserved hunting rights, in your view. Yes, Your Honor. And I think a good thing to point out here is, so the Shoshone is one tribe and the Bannock are actually a different tribe. It's a different language. They're combined now on Fort Hall Reservation, which is located in Idaho. But there's other groups of Shoshone out there, possibly other, and other groups of Bannock out there that are on different reservations that don't have recognized hunting rights. So Duck Valley in Nevada, on the Nevada-Idaho border, that has Shoshone on it. It also has Paiute, which I believe are closely related to the Bannock and they don't have reserved hunting rights. That's because they weren't party to this treaty? Yeah, because they weren't party to this treaty and they didn't move forward with it. But the people who were part of the treaty do have those rights. And if I understand your agreement, and I think concession, they had those rights before this treaty ever came along. They just reserved them. They all have them. Shoshone, the Northwest Band have them, the Bannock people have them, right? Yes, but part of that would be with the seeding of the 44 million. Million acres. Yeah, that's gone. They gave away all that land. Yeah, they would have. They reserved rights, but they gave away rights except to the extent that they as a political entity that signed the treaty reserved those rights moving forward. So, and another point I just wanted to touch on briefly is the Northwest Band took the position that sort of we could all share the town square as far as hunting rights between them and the show bands. Some of the rights we're dealing with are extremely limited. There's not just unlimited access to fish and game. Below in my brief, I cited the right to take fish on the Yankee Fork of the Salmon River. The direct take permit for the Shoshone Bannock tribes is a single Chinook salmon that they're allowed to take. It's an ESA listed species. It's extremely limited. There is real impact to the Shoshone Bannock tribes if they are required to share that. How does that go to the question of interpretation versus the questions of political cohesion and indispensable party? That really goes to the indispensable party, Your Honor. I just wanted to correct the record there. That would be back with the district court, right? Yes, Your Honor. If we, and again, just arguendo, if we were to rule that the hunting rights were independent and that tribe, Northwest Band, had those hunting rights, as does the Shoshone, I mean, the Bannock tribe, if we got to that. Everything goes back to the district court, right? To interpret indispensable parties and all that sort of thing, right? There'd be more issues that would have to be ruled on before you could say the Northwest Band had the hunting rights. The political cohesion would have to be. Again, forgive me, if I understand correctly, both parties are asking us to construe the language of the treaty. If we believe the language is clear, we don't have to send that back to the district court. That issue, do we? Not that issue, but there are other issues like political cohesion. The political cohesion is not before us, is it? No, I didn't cross that. All we have is the issue of this treaty and what the treaty means. So what I'm saying is, if I understand our mission correctly, if we believe that the Northwest Band has these hunting rights and we construe the treaty that way, that's what we do. And then we send the rest of the case back to the district court and then you do your indispensable parties and all that sort of thing where the Bannock tribe would have an opportunity to make its argument there in terms of the impact under the Endangered Species Act and the like, right? Well, what I'm trying to say is that the political cohesion issue was also relevant to whether the Northwest Band would have the hunting rights. The way I would envision it would be, if that was your ruling, it would be maybe that the moving to a reservation wasn't a conditioned precedent, but there's still other issues that have to be resolved, what happened post-1816. But forgive me, that's not before us, is it? That's not before you, but it's a remaining issue below. Well, I understand that. Again, I'm not trying to be smart-aleck about it. I'm just saying we have a limited mission, if you will. We've been asked to construe the meaning of the treaty. If, arguendo, we believe the language is clear, the district court was in error and that the hunting rights are more reserved, they're not contingent on moving to the reservation, if we decided that, there would be nothing further to decide on that issue, right? There may be implications that flow from that that would go to the district court, but that's it, right? What I'm trying to say is, I guess I'm not completely tracking what you're saying your ruling would be, but... I don't know what it would be either, but I'm just saying, hypothetically, if we ruled that way, isn't that the impact? It would still be fundamental that the Northwest Band would have to demonstrate political cohesion with the signatories of Fort Bridger if they were to have those rights going forward. Well, the question of whether even they have to demonstrate political cohesion was not addressed by the district court, was it? No, it wasn't. He declined to rule. The whole ball of wax regarding political cohesion, whether they're required to show it and if they are required to show it, what they have to show and whether they've met it is a complicated question of law and fact, correct? Yes. That the district court did not touch. He said he would have wanted to develop a factual record. So, I think the answer to Judge Smith's question is yes, then. If we were to find the interpretive issue to be clear, all we would do is remand to the district court to then reach the question of what is the law and political cohesion and what is the evidentiary factual record on that issue along with the indispensable party issue, correct? Yes, Your Honor. Yes. Other questions by my colleague. Thank you. We appreciate all counsel's argument in the case. This is obviously an important case. There's a lot we could talk about, but your time is up. Nobody reserved anything. So, we will assume that you said all the wonderful things that you thought you were going to say and the same with you and the case just argued is submitted. The court stands in adjournment for the day. All rise. This session of the court is now adjourned. Thank you.
judges: SMITH, FORREST, SUNG